Filed 8/6/24  In re S.C. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.C., a Person Coming Under the Juvenile Court Law. | B330769<br><br>(Los Angeles County Super. Ct. Nos. 20CCJP06611, 20CCJP06611A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Respondent,<br><br>　　　v.<br><br>J.M. et al,<br><br>　　Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant Y.C.

Tarkian & Associates, Arezoo Pichvai for Plaintiff and Respondent.

## INTRODUCTION

Mother Y.C. and father J.M. appeal from the juvenile court's order terminating their parental rights over son, S., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1] Mother argues that the court failed to account for the strong bond mother had with the child in terminating her parental rights and determining that the parental benefit exception did not apply. Father joins this argument. We find no error. We accordingly affirm.

## BACKGROUND[2]

### I. *Referral and Petition*

S. was born in May 2017 and is the only child of mother and father. At the time of intervention, S. was living with mother and mother's boyfriend, Nick. Father was incarcerated. The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) based on referrals in May and September 2020, alleging that mother and Nick were selling and using drugs and engaging in domestic

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother and father challenge only the court's finding that the parental benefit exception did not apply as to mother. We therefore summarize the facts as helpful for background and/or as relevant to that issue.

2

violence.  Both referrals were closed as inconclusive.  DCFS received the referral leading to the instant case on October 29, 2020, alleging that mother and Nick were using marijuana and inhalants, marijuana plants were growing in their home accessible to the child, and that there were concerns about the condition of the residence.

A DCFS children's social worker (CSW) visited mother's residence (the referral address) and observed a front yard cluttered with several items presenting a safety risk to three-year old S., as well as three marijuana plants in the yard.  Mother and S. were not present, but Nick spoke with the CSW and stated that the home should have been "condemned" and that the "roof was falling down."  He reported that the family planned to move out the following week.

A CSW served an investigative search warrant at the referral address on November 4, 2020. Mother and S. were not present; Nick said they were staying with maternal grandmother (MGM).  The CSW observed structural damage to some of the rooms of the home; one room had no roof and was exposed to the open air.  The police officer participating in the search pointed out several items that were likely associated with the occupants growing marijuana in the home.  DCFS also unsuccessfully attempted to locate mother and S. at S.'s daycare and MGM's residence.

On December 4, mother called the CSW and stated that she would have her attorney reach out to DCFS right away.  Mother stated that she and S. were temporarily renting a room from a friend.  The CSW visited the referral address again on December 8, after receiving a report that the family was moving back in. Nick was there and told the CSW that he was moving back in,

3

but mother and S. were staying with MGM.  He denied that mother was at the residence at that time, but then admitted that mother was inside.  He refused to tell mother that the CSW wanted to speak with her, and complained that DCFS was "harassing" the family.  Both S.'s daycare provider and MGM denied caring for S. since Thanksgiving.

Later on December 8, the CSW met mother outside of MGM's residence, and observed S. in the back seat of mother's vehicle.  Mother accused the CSW of following her, but agreed to allow the CSW to speak with the child. S. stated that he lived with Nick and mother.  When the CSW showed S. a photo of the marijuana plant taken at the referral address, S. said he had seen a plant like that before.  Mother claimed that she and S. had been staying alternately with MGM and at the referral address, but MGM denied that mother and S. had stayed with her. Mother also told the CSW that she and Nick had an agreement with the owner to fix the roof of their home; the owner denied any such agreement.

The court ordered S.'s immediate removal on December 11, 2020.  However, DCFS was unable to locate S. or mother at the referral address or at MGM's home.  The CSW spoke with mother by phone, who confirmed that she was aware of the removal order but declined to make a plan to allow the CSW to take S. into protective custody.  Mother continued to refuse to comply over the next several days.

On December 15, 2020, DCFS filed a dependency petition on behalf of S. under section 300, subdivision (b)(1).[3]  In count b-

---

[3]     Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction

4

1, the petition alleged that on November 4, 2020, as well as on prior occasions, mother's home had several marijuana plants that were easily accessible to the child. In addition, several rooms of the home had "no roof and damaged walls." Count b-2 alleged that father had a prior criminal conviction for possession or purchase for sale of narcotics and was a registered controlled substance offender.

Neither parent appeared at the December 18, 2020 detention hearing. The court found a prima facie case for jurisdiction over S. under section 300, subdivision (b)(1), and ordered S. to remain detained from both parents. The court ordered monitored visitation two to three times per week for both parents once they contacted DCFS. The court issued an arrest warrant for mother and a protective custody warrant for S.

## II. *Adjudication and disposition*

Nick emailed DCFS on January 12, 2021, refusing to turn S. over to DCFS. Mother and father appeared by videoconference at the next hearing on January 20, 2021. Mother had not disclosed where she and S. were located, so the court admonished her that the warrants remained outstanding. The court continued the matter. At the continued hearing on January 27, mother appeared in court with S., who was detained from mother

---

of the juvenile court which may adjudge that person to be a dependent child of the court: . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child. [¶] (B) The willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."

and placed in shelter care.  The court found father was the alleged father of S. and ordered monitored visitation for both parents.

In its jurisdiction/disposition report, DCFS reported speaking to S. on February 4, 2021.  S. reported that his home did not have a roof, but Nick (whom he referred to as "daddy") was fixing it.  Mother told the CSW that she wanted to reunify with S., that she thought the detention report was wrong, and that she would prove that she was the best mother for S.

The CSW met with S. and S.'s caregiver at her home on February 17, 2021.  The caregiver reported that S. was doing well; sometimes he would cry after mother's phone calls, but he was slowly adjusting to seeing mother through phone calls and visits.  Mother called S. once per day and visited twice per week.  The caregiver reported no issues with the visitation, except that she had to call mother each time to remind her of the visit and mother was "regularly" late.

Mother missed two drug tests in early February 2021.  The CSW confirmed with the testing facility that mother was enrolled in weekly testing, and provided that information to mother.  Mother missed three more tests in February and March.

Mother moved to a new apartment in Pasadena (the Pasadena address).  In an interview on March 10, 2021, mother told the CSW that she did not need individual counseling.  The CSW recommended that mother begin services and provided referrals, but mother stated she did not want to engage until services were court-ordered.  Mother stated her visits with S. were "great."  According to the CSW, during the interview mother was acting "strange and erratic," speaking rapidly and appearing anxious.  Mother agreed to take a drug test that day; the result

6

was negative. Mother missed her scheduled drug test the following week.

The CSW conducted an unannounced visit on March 23 during mother's visit with S. The caregiver reported that mother arrived five minutes late and that mother's boyfriend had dropped off food for mother and S. The caregiver stated that S. was eating and sleeping well, and no longer cried when mother's visits ended. The CSW observed mother and S. lying on the grass, with S. playing on mother's phone. S. told the CSW that he did not want "mommy to go" and wanted to play with mother. S. then asked the CSW to play with him. S. also stated that he wanted to stay with mother at home.

On March 24, 2021, the property owner of the referral address told DCFS that mother and Nick were still living at the residence and she was trying to evict them. Multiple neighbors complained about potential illegal activity at the residence, including drug dealing.

In an April 13, 2021 last-minute information, DCFS reported that father was arrested for violation of his probation and was currently incarcerated. DCFS did not know if mother was enrolled in any programs; the CSWs reported that when they tried to ask mother, she said she needed to speak with her attorney. Mother completed one negative drug test during this period of supervision and missed seven tests. The caregiver reported that mother was always late for her visits and did not show up or call for a scheduled visit on April 8. She also stated that mother never called to speak with S.

At the adjudication hearing on April 14, 2021, the court continued the matter for father's appearance. The court also ordered S. placed with MGM.

In another last-minute information filed May 26, 2021, DCFS reported that S. was doing well with MGM. The property owner of the referral address told the CSW that mother and Nick were still living at the residence. Regarding visits, the CSW reported that mother had been consistent and would bring activities. The CSW also reported that mother's behavior was "odd" at times, including that mother would get upset when S. called her "grandma." Mother failed to show for four additional drug tests. DCFS recommended continued reunification services for mother, but noted a continuing concern regarding substance abuse by mother and Nick.

The CSW visited mother at the Pasadena address on May 25. The home appeared appropriate. Mother said she lived there alone and had a bed there for S. The CSW stated that mother was consistently visiting S. and he appeared comfortable with mother. But the CSW expressed concern with mother's behavior during visits, explaining that mother would appear calm and then suddenly start yelling at MGM.

In July 2021, DCFS reported that Nick had been evicted from the referral address. Mother was living at the Pasadena address and visiting S. twice per week. Mother was not engaged in services as they had not yet been court-ordered. Mother continued to drug test inconsistently, with five negative tests and 19 missed tests between February and July 2021.

At the continued adjudication hearing on August 6, 2021, mother testified that she moved from the referral address in February 2021. She denied having any marijuana plants at the residence. The court again continued adjudication.

On August 17, DCFS reported that it received a call stating that mother and Nick were squatting in a warehouse. The caller

stated he was concerned about S., that law enforcement had been called more than once, and that mother "gets drunk and high all the time." The CSW met with mother while she was visiting with S. on August 19. The CSW observed that mother had extensive bruises and cuts on her legs, which mother said she sustained from falling in a warehouse while trying to find her phone. Mother downplayed her injuries and said that the warehouse belonged to a client of hers.

At the continued adjudication hearing on August 20, 2021, the court found that the evidence demonstrated that mother exhibited "deeply flawed judgment" that put S. at risk and further, mother had not acknowledged that any of her conduct was a problem or posed a risk. The court found mother's testimony denying many of the allegations was not credible, sustained counts b-1 and b-2 of the petition and found jurisdiction over S. S. remained detained with MGM. At mother's request, the court continued disposition.

The CSW received a call on September 21 from the reporting party regarding the warehouse (Mr. L.), who stated that he met mother about five months ago because his brother owned the warehouse at issue. Mr. L. reported that mother and Nick moved a lot of sound equipment into the building and mother told him she had been sleeping there every night to protect the equipment. Mr. L. stated that mother and Nick were "either high or stoned on cocaine pretty much every day of the week," and would throw parties at night and sleep all day. He said that mother was squatting in the warehouse and never visited her own apartment except when having visits with S. Mother agreed to drug test on September 21, but then failed to do so, claiming that she was ill. The CSW provided the court with

call logs reflecting police responding to the warehouse address 10 times between March and September, including several times for parties. DCFS concluded that mother had "not shown any change in thought or action since the beginning of the case," but was continuing the same behaviors and substance use.

In a last-minute information filed October 15, 2021, DCFS reported that MGM refuted some of the statements made by Mr. L, including that mother was staying at the warehouse. However, MGM provided a partial police report showing that mother and Nick were living in the warehouse. Mother continued to visit S. regularly, but missed three drug tests in September and October.

At the disposition hearing on October 18, 2021, the court found by clear and convincing evidence that it was reasonable and necessary to remove S. from his parents and that it would be detrimental to S. to return him to mother's custody. The court continued its order for monitored visitation for mother and father with DCFS discretion to liberalize. The court also ordered weekly drug testing for mother, individual counseling, and parenting programs.

### III. *Period of Review*

In an April 8, 2022 status review report, DCFS reported that father's whereabouts were unknown. Father's probation officer stated that he was not in compliance with his probation and a warrant had been issued for his arrest. Mother was arrested on November 26, 2021 for possession of nitrous oxide. In March 2022, mother reported that she had enrolled in a parenting program and individual therapy. Between October 2021 and the end of March 2022, mother tested negative for drugs 11 times, but missed 12 tests. Mother gave various

reasons for missing tests, including being sick, having to work, and her car being broken into.

DCFS reported that S. appeared happy with MGM, who was meeting his needs and ensuring that he had access to mental health services. Mother continued to visit S. twice a week for two hours per visit. She was regularly 15 to 30 minutes late for visits. The visitation monitor reported that mother played with S. during the visits, but was inconsistent with discipline and would immediately give in if S. pouted or cried.

DCFS assessed the risk level for harm in returning S. to mother 's care as "high." It concluded that although mother had made efforts by enrolling in court-ordered classes, she was inconsistent with her testing and had not begun services until recently. As a result, DCFS had not liberalized her visitation and had not been able to assess mother's "ability to ensure child safety and her ability to maintain a drug-free lifestyle." DCFS recommended six more months of services for mother in light of her efforts to comply with her case plan.

At the April 14, 2022 review hearing, the court found that mother was in partial compliance with her case plan and continued her reunification services. The court ordered mother to complete a full drug treatment program and a minimum of 12 hours of parenting classes. The court cautioned mother that "your conduct in this case from beginning to today indicates to me that you are not taking this seriously." The court told mother that she had "a lot of work to do" prior to the next hearing or her services would be terminated.

In its status review report filed June 3, 2022, DCFS reported that mother was arrested on April 16, 2022. Police officers investigating a group of individuals outside a home found

her with a glass pipe commonly used to smoke methamphetamine. Mother denied that the pipe belonged to her.

DCFS reported that S. appeared happy and bonded to MGM and she was continuing to meet his needs. MGM stated she was willing to provide permanency to S. through a legal guardianship if he was not able to reunify with mother. As for her progress in her case plan, mother completed 12 hours of parenting classes in May. She had completed five sessions of individual therapy, but discontinued participation because of the cost. Mother stated that she had enrolled in Telehealth sessions instead and was scheduling her first session. Mother enrolled in a drug and alcohol program on May 10, but was discharged later that month for non-compliance. While in the program, mother tested positive for methamphetamine on May 3, 2022. When the CSW later asked mother about the positive drug test, she denied any drug use. Mother had seven negative drug tests in April and May and did not miss any tests. DCFS concluded that mother's risk assessment for reunification was "high" as she had demonstrated minimal compliance with court orders and remained inconsistent with programs and testing. Mother's continued association with individuals engaging in criminal activities also posed a risk to S.'s safety. DCFS recommended terminating reunification services.

In a last-minute information filed September 8, 2022, DCFS reported that father was currently incarcerated. Mother had no further arrests since the last report. Mother continued to consistently visit S., but regularly arrived late. The CSW stated that mother had stopped communicating with DCFS after the last hearing in June, and DCFS had no new information on her participation in any programs. Mother submitted to a

psychological assessment on June 6, 2022; the psychiatrist diagnosed mother with bipolar disorder, and recommended mood stabilizers and further assessment. DCFS continued to recommend termination of reunification services for mother.

On September 12, DCFS reported that mother continued her enrollment in weekly drug testing. Mother tested negative four consecutive times from May 24 to June 15, 2022. She then missed nine tests from June 27 to September 7. Mother submitted a letter to the court, stating that she continued to live alone in her Pasadena apartment and had "everything my son needs for his care and safety." She also stated that she had completed the parenting classes and psychiatric assessment required by the court, but could not afford to leave her "occupations as a Real Estate Agent and Executive Assistant" to enter a drug treatment program. Mother stated she was moving to dismiss the case based on DCFS's "failure to meet the State and Federal guidelines for removing a child from the mother's home," failure to provide proper services, and failure to follow court orders and procedures.

DCFS submitted service logs during this period reflecting mother's twice-weekly monitored visitation with S. at the park. S. told DCFS that he loved to play at the park and on the swings with mother, and that he liked talking to the visitation monitor. Mother usually brought food for her and S. to eat and sometimes brought activities or a new toy. Mother always greeted S. with a hug and kiss and played with him. S. also often ignored mother's instructions and grabbed mother's phone when she would not allow him to play games on it. During a visit on April 28, the monitor reported some unusual behavior by mother, including rocking back and forth and laying down while S. was playing.

After the monitor told mother she should not be sleeping during the visit, mother called S. over and gave him her phone to play games. S. spent the last 45 minutes of the visit on mother's phone, while mother sat with her back to the monitor, seemingly dozing on and off. At another visit in June, mother was 28 minutes late. When she arrived, S. wanted to play on mother's phone and she told him no. The monitor reported that S. was whiny and moody for the rest of the visit because he was not getting his way. Mother started mocking his behavior, then S. started kicking her. Mother told him to stop, then eventually gave in and let S. play on her phone. S. continued to ignore mother's directions and whine when he could not do what he wanted, and mother would give in.

After several continuances, the court held the next review hearing on October 10, 2022. The court found that continued jurisdiction was necessary, it would be detrimental to S. to return him to his parents, and mother had not made substantial progress toward alleviating or mitigating the circumstances necessitating placement. The court found that mother "has shown a chronic problem of substance abuse and poor judgment . . . , [and] an inability to accept responsibility and be truthful with the court and herself." The court terminated reunification services for mother and father[4] and set the matter for a permanency planning hearing.

---

[4] Although the court initially denied reunification services for father, there was some confusion in the record regarding whether father ever received services. The court therefore terminated father's reunification services to the extent any had been granted.

14

## IV.    *Termination of Parental Rights*

DCFS filed a section 366.26 report in January 2023, stating that S. was doing well and MGM's home was safe and appropriate.  Mother continued visiting S. twice per week, monitored by MGM starting in September 2022.  S. told DCFS that mother was fun. DCFS reported that it was "evident that the child and mother share a bond as mother continues to be present in the child's life."  MGM stated that she had no concerns regarding mother's visits and that S. enjoyed them.  DCFS concluded that, having reviewed the visitation notes, it "was noted that mother and the child have a bond which is why DCFS believes the best plan of permanence for the child is Legal Guardianship."  MGM continued to be willing to provide permanency to S. through legal guardianship, so that mother might have a chance to reunify with S. if she was able to improve. DCFS observed that MGM and S. had a strong attachment to each other.  S. told DCFS that he loved mother and mother was "more fun because she buys him anything he wants."  DCFS recommended appointing MGM as S.'s legal guardian, with continued monitored visitation for both parents.

On January 24, 2023, mother filed a request to dismiss the dependency case and also for a change in court orders.  She filed the document herself, although she continued to have appointed counsel.  Mother argued that she was never properly served with the petition, the court lacked jurisdiction, DCFS filed fraudulent reports regarding her treatment of S., and the court forced her to comply with an unnecessary case plan.  The court denied the motion and admonished mother to file papers only through her counsel.

In a February 2, 2023 last-minute information, DCFS reported that MGM was now interested in adopting S. and it was therefore changing its recommendation to adoption. The court continued the matter and ordered DCFS to include an analysis of the *Caden C.* factors[5] in its next report.

DCFS filed an updated section 366.26 report on March 29, 2023. S. was in kindergarten, and he was also enrolled in Taekwondo, math tutoring, Russian, and Korean. He was not in therapy as DCFS reported he was doing well. Mother's prior visitation monitor reported that during visits mother often appeared to be under the influence or coming off of a substance. On some occasions mother would fall asleep during the visit and S. would play on her phone. The monitor also reported that mother was unable to set appropriate boundaries. MGM continued to monitor mother's visits without incident until February 2023, when she asked for assistance to monitor the visits because mother was upset after a court hearing. A CSW monitored mother's visit on March 7, 2023. Mother was 10 minutes late. S. appeared upset and said that he wanted to go with mother, but she was always late. S. was excited to see mother when she arrived. Mother brought food and a photo

---

[5]     *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). As discussed further below, *Caden C.* set forth three elements a parent must show to establish the parental benefit exception to termination of parental rights: (1) regular visitation with the child; (2) "the child has a substantial, positive, emotional attachment to the parent"; and (3) terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

album to share with S. Mother and S. also read a book together and played a computer game. Afterward, MGM stated she was comfortable to monitor the visits again, as mother seemed to be doing better.

The report also included DCFS's "bonding assessment" under *Caden C.* as requested by the court. Regarding the first element—regular visitation with the child—DCFS reported that mother had maintained consistent and regular visits with S. As for the second element—a substantial and positive parent-child relationship—DCFS noted that mother had not yet completed a full drug and alcohol program and it was unknown whether she continued to abuse drugs since she was not enrolled in a program or testing for DCFS. DCFS opined that mother's failure to mitigate her substance abuse issues posed a risk to S. as a young child requiring care and supervision. DCFS acknowledged that mother said she was ready to care for S. and had a bed for him in her apartment. However, mother had not been able to progress from unmonitored visits. S. appeared to have a good relationship with mother, he expressed that he had fun with her during visits and loved mother because they play and he feels safe with her. According to MGM, S. asked why mother could not live with them or visit at MGM's home, but he no longer cried at the end of his visits. The visitation monitors observed that S. viewed mother as his mother, but he was able to manipulate mother to do what he wanted.

Regarding the third element—whether the harm of severing the relationship outweighed the benefits of adoption—DCFS opined that if visits were terminated, S. would be affected, as mother was consistent in her visits. However, DCFS noted that S. was also affected by mother's chronic lateness. DCFS also

stated that severing S.'s relationship with mother would not greatly adversely affect him, as he had established a strong bond and attachment to MGM and she continued to allow mother and S. to develop a relationship. DCFS also noted that S. was "emotionally stable" after visits. According to DCFS, adoption would benefit S. by providing him with permanency and continued stability in a home he had been in since he was three years old. MGM told DCFS that while she previously wanted to have legal guardianship of S., she now was willing to adopt S. because it was the most permanent plan for him.

DCFS concluded that while mother had consistently visited S. and developed a relationship with him, he viewed her as the fun parent who played with him and he did not have a difficult time leaving visits.

In a June 2023 interim review report, DCFS reported that father had joined mother's twice weekly visits, which continued to be monitored without incident by MGM. S. said he was excited about visits with both parents. DCFS reported that the case was adoption ready and there were no barriers to adoption. DCFS observed that MGM was a loving and patient caregiver for S. and they had a close and loving relationship. S. was an active and happy child. In an interview on May 18, 2023, S. stated that he loved MGM and wanted to continue living with her. DCFS recommended terminating parental rights and proceeding with adoption.

At the July 11, 2023 permanency planning hearing, mother's counsel stated that mother had just filed a section 388 petition seeking a home of parent order or, alternatively, additional reunification services. The court denied the petition, finding that mother had not shown changed circumstances, and

that her "drug use and her failure to be forthcoming about it has been an issue throughout this case." The court also found that mother "has consistently shown an inability to follow court orders and complete programs."

Turning to termination, mother's counsel asked the court to find that the parental bond exception applied and also to order a legal guardianship instead of adoption. She noted that mother was consistent in her visits and that DCFS had acknowledged mother's bond with S. The court acknowledged that mother visited S. and had remained in his life, but that she had displayed throughout the case an "inability to be stable in her own life and to confront and acknowledge the problems identified by . . . the court and the department." The court explained the concern that "if I were to order a legal guardianship, mother would continue for years to come back to the court, ask the court to terminate legal guardianship even though she has shown a clear inability to acknowledge, admit, and address the problems in the sustained petition. This would lead to instability in S[.]'s life." The court further found that S. had spent half of his life with MGM, who provided "stability, love, and care," and she and S. had developed a "very strong bond." S.'s counsel added that mother seemed unable to set boundaries during visits and at times appeared to be under the influence. The court agreed, finding that mother's visits were consistent but "of low quality. And the bond is merely as . . . though mother is a friend to S. and not the strong parental bond that is required. . . . And her inability to take a parental role and redirect her son to make good decisions is consistent with . . . her own lifestyle." The court further found that any benefit accruing to S. from his

relationship with mother was outweighed by the benefit of adoption, and that adoption was in S.'s best interests.

During the hearing, mother (who was attending by phone) ignored the court's admonishment to wait to speak until invited by her counsel and refused to take her phone off of the speaker phone setting despite the confidentiality of the proceedings. She stated that she was demanding recusal of the judge for "fraud" and demanding a "judicial review." After warning mother repeatedly, the court placed her in the virtual lobby, noting that mother "is showing again that she's not stable, not able to follow up court orders."

The court found by clear and convincing evidence that S. was adoptable. The court concluded that no exceptions to adoption applied and terminated the parental rights of mother and father. The court ordered adoption as the permanent plan and designated MGM as the prospective adoptive parent.

Mother and father timely appealed from the court's order.

## DISCUSSION

Mother contends the court erred in finding that the parental benefit exception to adoption did not apply and thereby terminating her parental rights pursuant to section 366.26. Father joins mother's arguments but does not raise any points of his own. We find the court did not abuse its discretion in concluding that mother had not established the necessary exception.

### A. *Legal Principles*

#### 1. **Parental benefit exception**

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has decided to end reunification services,

20

adoption is the legislative preference.  (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"])  Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can establish one of the exceptions set forth in section 366.26, subdivision (c).  (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *Caden C., supra*, 11 Cal.5th at p. 625.)

The specified circumstances in section 366.26, subdivision (c)(1)(B) are "exceptions to the general rule that the court must choose adoption where possible."  (*In re Celine R., supra*, 31 Cal.4th at p. 53.)  "At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.'  [Citation.]  The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption."  (*Ibid.*; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The exception at issue here is the parental benefit exception, which permits the selection of another permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  In *Caden C., supra*, 11 Cal.5th at p. 631, our Supreme Court "discern[ed] three elements the parent must prove" to establish the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i).

First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account

the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id.* at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing the relationship with the parent, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

For the third element, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of

22

placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

## 2. Standard of review

In *Caden C., supra*, 11 Cal.5th 614, our Supreme Court clarified the standard of review applicable to a juvenile court's findings regarding the parental-benefit exception. The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual; we therefore review those findings for substantial evidence. (*Id*. at p. 640.) The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Ibid*.) This requires a "hybrid" standard of review. (*Id*. at pp. 640-641.) Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent, which we review for substantial evidence. (*Id*. at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

We also note that, unlike in *Caden C.*, the juvenile court here found that mother did not meet her burden of proving the exception. In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof

23

did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.  This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.)  Thus, to the extent mother challenges the juvenile court's findings regarding her failure of proof, we determine whether the evidence compels a finding in mother's favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding.  (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.)

### B.    *Analysis*

The juvenile court expressly found that mother met the first element under *Caden C.*, as she consistently visited S. throughout the dependency proceedings.  No party challenges that finding on appeal.  Instead, the parties focus their arguments on the second and third elements.

To prove the second element—that S. would benefit from continuing their relationship—mother needed to show that S. had a "substantial, positive, [and] emotional attachment" to her. (*Caden C., supra*, 11 Cal.5th at p. 636.)  That meant demonstrating that S.'s attachment was "significant" and conferred more than "some incidental benefit" to the child.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  The court was entitled to consider factors including "'[t]he age of the child, the

24

portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  We are not persuaded that mother has established that the evidence compels a finding in her favor on this element.

At the time of the section 366.26 hearing, S. was six years old.  He had spent almost half of his life, more than two and a half years, out of mother's custody, and the majority of that time with MGM.  Although the court and DCFS recognized that mother and S. shared a bond, the court found that their relationship was closer to the nature of friends, rather than a parent and child, and that their visits were "of low quality."  There is ample evidence in the record supporting that conclusion.  The visitation logs show that S. often spent much of his time during visits playing with mother's phone and playing with other children.  Although they hugged and kissed at the start and end of visits, there is little evidence in the record of affectionate interactions during the visits.  S.'s statements about mother echoed this relationship—he told DCFS that he loved to play with mother and that she would buy him what he wanted.  DCFS observed that mother was not able to set appropriate boundaries for S. and would give in to his demands.

Moreover, the visitation monitor and DCFS both expressed concern that mother frequently behaved erratically during visits, including lying down, appearing to be asleep, and yelling.  As mother points, out, her continued struggles with substance abuse may not on their own be used as a bar to applying the exception.  However, these struggles are relevant to the extent they impact the relationship with the child, as, for example, "[a] parent's

25

struggles may mean that interaction between parent and child at least sometimes has a "'negative" effect' on the child." (*Caden C., supra*, 11 Cal.5th p. 637.) Here, the court was entitled to find that mother's conduct during visits negatively affected her relationship with S.

Mother largely ignores the evidence of her struggles, instead pointing to other evidence she contends shows that she acted as a parental figure and had a substantial and positive bond with S. We are not permitted to reweigh the evidence but must make all reasonable factual inferences in favor of the judgment. It is undisputed that there is some evidence of positive aspects of the relationship between mother and S. But "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C., supra*, 11 Cal.5th at p. 640.)

Even if we were to conclude that mother had met her burden to establish the second element, we find no error in the juvenile court's conclusion that she did not meet the third, i.e. she did not establish that terminating her relationship with S. would outweigh the benefits of adoption.

Although MGM initially stated that she preferred a legal guardianship in order to allow mother the chance for reunification, MGM ultimately decided she was willing to adopt S. in order to offer him permanency and stability. DCFS's recommendations agreed with these caregiver preferences. Mother contends, without support, that the court gave "extra

26

weight" to the legislative preference for adoption in expressing concern that mother could continue to seek to interrupt the guardianship in the future while failing to address her ongoing issues. "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R., supra,* 31 Cal.4th at p. 53.) Here, S. was thriving in MGM's care, and she had provided a stable, loving home for the child for almost three years. S. was no longer upset when visits ended and expressed a desire to live with MGM. In addition, the court was entitled to consider mother's behavior throughout the case, including her refusal to cooperate with DCFS or abide by court orders, in determining that legal guardianship would not give S. the stability he needed and in weighing more heavily the benefits of adoption by MGM, a stable and loving caregiver to whom S. was deeply bonded. We find no abuse of discretion in this conclusion.

We are not persuaded otherwise by mother's citation to cases upholding a trial court's finding that legal guardianship was in the child's best interest. For example, in *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1532, mother consistently visited her twin sons throughout the dependency proceedings and had a close, loving relationship with the children. The trial court ordered legal guardianship for the children, finding that mother had maintained regular visitation and the children would benefit from continuing their relationship with her.[6] (*Id.* at p. 1533.)

---

[6] Of course, neither the juvenile court nor the court of appeal had the benefit of *Caden C.*, which was not decided until 2021.

27

DCFS appealed, arguing that there was insufficient evidence to support the finding that termination of parental rights would be detrimental to the children. (*Ibid*.) A different panel of this court affirmed, finding that the "trial court obviously credited the testimony from both mother and grandmother that there was a close bond between mother and the boys, and that a continuation of contact would be beneficial to the children. DCFS did not present any evidence to the contrary." (*Id*. at p. 1537.) As such, "[s]ubstantial evidence supports the trial court's conclusion that mother had maintained regular visitation and that the children would benefit from continuing the relationship." (*Ibid*.) This court also noted that DCFS could not rely on an absence of evidence regarding the quality of mother's visits when it was *DCFS* that failed to provide such information in its reports. (*Id*. at pp. 1537-1538.)

Here, the juvenile court found mother's testimony not credible and concluded that mother and S. did not have a substantial enough relationship to outweigh the benefits of adoption. Mother has not demonstrated that the court erred in weighing the benefits and burdens of that relationship and concluding that the evidence demonstrated that adoption was in the best interest of the child.

"'The statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Caden C*., *supra*, 11 Cal.5th p. 641.) The record demonstrates that the juvenile court properly analyzed the *Caden C*. factors. As such, we find no error by the

juvenile court in concluding that mother failed to satisfy the parental benefit exception.

## DISPOSITION

The order terminating mother's and father's parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


ZUKIN, J.